UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| ALKALI SCIENTIFIC, INC., <br><br> Plaintiff, <br><br> v. <br><br> MIN QI WANG, a/k/a MINQI WANG, a/k/a MITCH WANG, a/k/a MITCH WANGANG, EHDS INTERNATIONAL LLC, EHDSTECH, INC., and DOES 1 through 10, <br><br> Defendants. | Case No. 21-cv- <br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, ALKALI SCIENTIFIC, INC. ("ALKALI" or "Plaintiff"), by and through its undersigned counsel, FISHERBROYLES, LLP, brings this action against MIN QI WANG, a/k/a MINQI WANG, a/k/a MITCH WANG, a/k/a MITCH WANGANG, EHDS INTERNATIONAL LLC,  EHDSTECH, INC., and DOES 1 through 10, and states and alleges the following:

## DESCRIPTION OF THE ACTION

1. As the COVID-19 pandemic wreaked havoc on the world in 2020, governments and private organizations scrambled to provide lifesaving personal protective equipment to their citizens and workers – particularly to front-line healthcare and safety workers – who, due to their occupations, were especially vulnerable to falling victim to the virus because of their continued contact with large numbers of people.  King County in Washington State was no exception, and in November, 2021, King County issued a solicitation for 500,000 N95 masks.  Plaintiff ALKALI was awarded a purchase order by King County to provide 500,000 N95 Health Care Particulate Respirator and Surgical Masks.

1

2.	Unfortunately, when there is great need there are also those who seek to prey on those in need, like Defendant MIN QI WANG, AKA MINQI WANG, AKA MITCH WANG, AKA MITCH WANGANG (hereafter "WANG"), his related companies, EHDS INTERNATIONAL LLC and EHDSTECH, INC. (hereafter "EHDS INTL." and "EHDSTECH") and unknown co-defendants DOES 1 through 10.  After learning that ALKALI sought large quantities of N95 masks to satisfy the King County order, WANG, individually and through EHDS INTL. and EHDSTECH, along with DOES 1-10 sought to induce ALKALI to purchase N95 masks, and did sell and participate in sales of masks to ALKALI in large quantities.

3.	ALKALI purchased a total of 437,120 purported 3M Company ("3M") N95 model 1860 masks from, with the assistance of and through Defendants, for a total of USD $1,434,500.

4.	However, none of the masks were made by 3M.

5.	All of the masks purchased by ALKALI from and through Defendants were shipped to King County, Washington.  On or about February 11, 2021, U.S. Customs and Border Protection ("CBP") seized all the masks in King County possession as counterfeit.  The masks were seized and subject to forfeiture by CBP under the provisions of 18 U.S.C. § 981(a)(1), 18 U.S.C. § 1956(c)(7)(D), 18 U.S.C. § 1961(1)(B), and 18 U.S.C. § 2320 for trafficking in counterfeit trademarks.

6.	To date, Defendants have not reimbursed Plaintiff ALKALI for the moneys it paid for the counterfeit masks seized by CBP despite ALKALI's demand for reimbursement.  Defendants have not reimbursed ALKALI for its lost profits on the cancelled sale of the seized masks despite ALKALI's demand that they do so.

7.  Accordingly, ALKALI herein asserts claims for: (i) breach of contract; (ii) negligent misrepresentation; (iii) fraudulent misrepresentation; (iv) tortious interference; (v) quantum meruit; (vi) unjust enrichment; and (vii) conspiracy.

## PARTIES

8.  Plaintiff ALKALI SCIENTIFIC, INC. is an Iowa Corporation with its principal place of business at 5370 NW 35th Terrace, Suite 112, Fort Lauderdale, FL 33309.

9.  Upon information and belief, WANG is a resident of Howard County, Maryland, residing at 12828 Macbeth Farm Lane, Clarksville, Maryland 21029.

10. Defendant EHDSTECH is a Maryland corporation with its principal office in Rockville, Maryland at 30 W. Gude Drive, Unit 210, Rockville, Maryland 20850.  MINQI WANG is listed as the registered agent for EHDSTECH, with an address at 12828 Macbeth Farm Lane, Clarksville, Maryland 21029.

11. EHDS INTL. is a Maryland limited liability company that was dissolved pursuant to Articles of Cancellation filed on December 7, 2016.  EHDS INTL.'s principal office was listed as 12828 Macbeth Farm Lane, Clarksville, Maryland 21029. Upon information and belief, Defendants WANG and one or more DOE defendants were shareholders or otherwise owners of Defendant EHDS INTL.

12. The true names and capacities of defendants DOES 1 through 10, whether individual, plural, corporate, partnership, associate, or otherwise are unknown to Plaintiff.  The full extent of the facts linking said DOE defendants to the causes of action alleged herein are unknown to Plaintiff at this time.

## JURISDICTION AND VENUE

13. The causes of action asserted in this Complaint arise from contracts by and between ALKALI, WANG, and/or EHDSTECH and/or EHDS INTL., and/or other Defendants and the sale, pursuant to those agreements, of counterfeit N95 masks to ALKALI.

14. This Court has personal jurisdiction over Defendants because all named defendants are or were residents in the State of Maryland. Furthermore, ALKALI representatives visited EHDSTECH and/or EHDS INTL.'s warehouse located in Baltimore, Maryland to complete the first purchase of purported 3M masks.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16. The Court further has original jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the claims herein are so related that they form part of the same case or controversy.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because all the defendants are residents of the State of Maryland.

## FACTS

18. Beginning in mid-2020, ALKALI representatives contracted with WANG and EHDS INTL., to purchase personal protective equipment ("PPE") for ALKALI's customers. Several purchases were made by ALKALI with payment made to EHDS INTL.

19. On December 1, 2020, Plaintiff ALKALI was awarded a contract to provide King County, Washington with 500,000 N95 Health Care Particulate Respirator and Surgical Masks, for a delivered price of USD $2,449,975.

20. In December 2020, ALKALI contacted WANG inquiring whether WANG, EHDSTECH, and/or EHDS INTL. could provide N95 masks so that ALKALI could fulfill its contract. WANG informed ALKALI that his company was an authorized 3M dealer. WANG, EHDSTECH, and/or EHDS INTL. knew or should have known that the masks were intended to be sold to and used as PPE by public safety personnel working for King County, Washington.

21. On December 29, 2020, and at other times, WANG gave assurances to ALKALI that the N95 masks for sale were authentic N95 masks manufactured by 3M, of St. Paul, MN, the leading N95 masks maker worldwide. WANG provided both written and verbal assurances of the masks' 3M origin, and WANG sent photographs by text to one of ALKALI's managers, Jason Arbinger ("Arbinger"), showing packaging and labeling of 3M N95 model 1860 masks.

22. On December 29, 2020, to induce ALKALI to purchase the purported 3M N95 masks, WANG wrote to Arbinger: "Jason, 3M 1860 N95 arrived this afternoon. See the packages and specs. Mitch". WANG also wrote, "This is original 3M packaging."

23. On December 29, 2020, WANG wrote to Arbinger: "I got word that 200,000 [masks] will arrive this week, and 100,000 will arrive early next week."

24. Upon information and belief, WANG knew that the masks he was offering to ALKALI were not in fact made by 3M but were imported from a non-3M manufacturer overseas. Upon information and belief, the masks were actually made in and shipped from the People's Republic of China.

25. On or about December 24, 2020, ALKALI wired USD $39,600 in payment to EHDSTECH for the shipment of 12,000 3M masks.

26. On December 30, 2020, WANG, EHDS INTL., and/or EHDSTECH sold 12,000 purported N95 masks to ALKALI. On this same date, the boxes of masks were packed by

5

WANG and other EHDS INTL. and EHDSTECH personnel for shipment to ALKALI's customer, King County.

27. On January 1, 2021, ALKALI invoiced King County for 500,000 N95 masks in expectation of delivering under the King County purchase order.

28. On January 2, 2021, the shipment of the first 12,000 masks arrived in King County, Washington.

29. On December 31, 2020, WANG provided additional assurances to ALKALI that the masks Defendants sold to ALKALI were made by 3M.  WANG sent additional photos of EHDSTECH and/or EHDS INTL. personnel in their warehouse in front of stacks of boxes marked "3M".  WANG also sent photos of the lot number of the masks and a picture of a mask clearly marked "3M".

30. On December 31, 2020, WANG assured ALKALI that the remainder of ALKALI's order for 300,000 masks would soon be available.  He advised Arbinger: "there are 190,000 pieces landed in NY as of now, the remaining 110,000 will arrive next week. It is probably too late to arrange the pickup today as tomorrow is the new year."

31. Arbinger responded to WANG: "Let's move on the 190K. Can you give payment needs/timing you expect."  WANG replied: "It is too late to wire the funds today. You can do so Monday and pick up on Monday.  This is the same brand and the same price."

32. On January 3, 2021, WANG wrote to Arbinger: "it is better off that you will come to NY distribution center, inspect, pay and take the product. As of last Friday, 190,000 arrived, by the end of Monday, more are expected to arrive making the total of 250,000 to 300,000."  WANG wrote further: "If these look agreeable to you, I will forward the address of the center, their routing/account, and arrange the meeting time.  Mitch".

6

33. Arbinger replied: "Hi Mitch. I received this. Things change often. Anyways let's work on this." WANG replied further: "Well, the change is primarily the pickup location. For most cases, we do so in our warehouse so that we can work on the shipping or pickup, arranging the inspection and flexibility of payment… I think that by doing it direct with the distribution center, it would reduce the burden of logistics on both ends."

34. At this point, Arbinger believed that WANG was seeking to introduce a third party into the sale of the masks. WANG sought to obfuscate and convince Arbinger to complete the purchase. On January 3, 2021, Arbinger wrote:

> Hi Mitch : thank [sic] for all your work on this. We can come to a NY distribution ctr, inspect and pickup. All Payments, terms and arrangements are with you alone. :-) We are your customer. We are paying you. We cannot negotiate with anyone else. Returns are not expected. No logistics are needed. Just a pick up address w. ready pallets. You are introducing a third party, it seems. Please clarify as you can.

35. Later on January 3, 2021, WANG replied:

> Hi Jason, understand your points here. One thing I'd like to assure you is that there will be no new negotiations. If you are not comfortable with submitting your payment before picking up the product, you come and inspect first before payment. You could bring a cashiers check if you prefer. If you are not happy with the quality of the product, there are no obligations to buy anything. You are a preferred customer, we want to protect your company."

36. Arbinger wrote back: "Pls clarify, I'm paying a different company and not paying you? I thought we were buying these from you . . as you are a [3M] dealer and so on."

37. The party to whom Arbinger was referring was AX Capital, Inc. WANG replied to Arbinger's concerns on January 3, 2021, "**We are business partners. I can guarantee your funds with our company funds and assets**."

38. On January 4, 2021, WANG wrote to Arbinger: "As of this noon, more products have arrived making the total quantity to be 300,000. There is no obligation on how many you want to take. The max is 300,000."

7

39. Arbinger replied: "Thank you. We have our eye on 260K. We will not inspect more than that quantity, tomorrow."  WANG replied: "Got it. Thank you!"

40. On January 4, 2021, Arbinger wrote to WANG: "Mitch, what is the latest?" WANG replied: "I am waiting for the response from m [sic] business partners and will let you know as soon as I have the info."  WANG then informed Arbinger to contact a Mr. Xu, giving his phone number and the address of a warehouse, in Brooklyn, New York, as well as payment routing instructions to AX Capital Inc.  WANG made further representations to Xu's reliability, writing to Arbinger: "I know Mr Xu has been in business for many years and is a reputable person."

41. On January 5, 2021, ALKALI representatives visited the warehouse in Brooklyn and inspected the masks.  WANG wrote to Arbinger: "the agreement is that you inspect without any financial obligations, but once you are happy with the product as Ryan called me and said '..good and real…' you need to pay before you can take the product away.  Please do so immediately. Thank you!"

42. Later on January 5 WANG wrote to Arbinger: "Jason, you did not release the funds. You have to go to the bank to release the funds. This happened to me the last time when you wired the funds but did not release it, we did not get the funds until several days later. Please do so asap. Otherwise the driver will get stuck at the warehouse. Thank you!"

43. When payment did not go through immediately, WANG informed Arbinger: "I am unable to convince the seller to let the driver take the product away and wait for the payment." WANG further stated: "We came to a solution. That is to have our attorney draft a letter and have you sign it to honor the payment."

44. WANG sent a letter to Arbinger on January 5, 2021 which acknowledged receipt and acceptance of the products by ALKALI. Arbinger signed the letter and returned it to WANG.

45. On January 5, 2021, ALKALI transferred by wire payment USD $858,000 to the account of AX Capital, Inc., Defendants' business partner, in payment for receipt of 260,000 masks.

46. On January 6, 2021, WANG wrote to Arbinger, "I am so sorry for yesterday's transfer mess. I had no slightest doubt about you and tried to convince Xu to let the driver take the product and the funds would come. Finally I had my attorney create a letter to resolve it. The driver was able to drive away without having to stay there overnight."

47. Upon information and belief, WANG and AX Capital, Inc. knew that the masks being sold were not made by 3M.

48. Upon information and belief, WANG and AX Capital, Inc. agreed to misrepresent the masks as 3M N95 masks, when they both knew that they were not made by 3M and did not meet N95 specifications.

49. Upon information and belief, WANG and AX Capital, Inc. agreed to share in the proceeds of the purchase of masks by ALKALI, and did share in the proceeds of their joint efforts to defraud ALKALI by selling counterfeit masks as authentic 3M N95 masks.

50. In reliance on the written and oral statements by WANG and other representatives of EHDSTECH and EHDS INTL. concerning the authenticity of the purported 3M N95 masks and the guarantee of ALKALI's funds in dealing with Defendants' business partner, AX Capital, ALKALI purchased 260,000 counterfeit N95 masks believing them to be authentic 3M N95 masks.

51. On January 12, 2021, King County received the shipment of 260,000 masks.

52. On January 22, 2021, WANG arranged the third purchase of N95 masks by writing to Arbinger: "165,120 3M 1860 N95 will be ready for pickup Monday. The warehouse, brand and the price ($3.3) are the same. . . . If you confirm to purchase, we will set the product aside for you and provide the account/routing numbers. Thank you! Mitch."

53. On January 25, 2021, WANG coerced Arbinger to commit to purchase the 165,120 purported 3M N95 masks when he wrote: "If you do not inspect and purchase, another buyer has come and wanted to purchase. If you confirm buy or not, I will make decisions accordingly. Thank You! Mitch". WANG continually conflated himself, EHDSTECH, and EHDS INTL. with Xu and AX Capital on the sales of the two large mask shipments.

54. On January 25, 2021, ALKALI transferred USD $536,900 by wire payment to the account of AX Capital, Inc., WANG's business partner, in payment for receipt of the 165,120 purported 3M N95 masks.

55. On January 27, 2021, ALKALI issued a purchase order to AX Capital, Inc., the partner of WANG, EHDSTECH and/or EHDS INTL, for 425,120 masks in the amount of USD $1,394,900.

56. ALKALI shipped the masks purchased from and through Defendants to King County, Washington in fulfilment of their purchase order of December 2, 2020. The third shipment of masks totaling 165,120 masks arrived at a King County facility on February 1, 2021.

57. The masks purchased from and through Defendants were not in fact made by 3M and did not meet the N95 masks specifications.

58. On or about February 8, 2021, King County telephoned Arbinger to inform ALKALI that the masks sold by ALKALI to King County were believed to be counterfeit.

59. On or about February 11, 2021, CBP seized the masks from King County.

60. On or about February 13, 2021, Arbinger telephoned WANG to tell him of the seizure and demanded to know how the masks could be counterfeit. Arbinger revoked acceptance of the masks purchased directly from Defendants and their business partner AX Capital.

61. On March 22, 2021, King County informed ALKALI by email that CBP had seized all the masks delivered to King County as counterfeit, and that they would not pay for any of the masks that had been shipped.

62. On March 30, 2021, CBP informed ALKALI that the masks had been seized on February 24, 2021, as counterfeit and in violation of trademarks.

63. The sales of goods by and through Defendants to ALKALI were exclusively for the purchase of goods, not services.

64. ALKALI revoked its acceptance of the masks in communications with WANG and the other Defendants in February 2021, as well as on August 27, 2021.

## COUNT ONE – BREACH OF CONTRACT

65. Paragraphs 1 through 64 are hereby incorporated by reference.

66. ALKALI entered into three agreements to purchase specific quantities of purported 3M N95 masks from and through Defendants.

67. ALKALI paid Defendants in full for the purported 3M N95 masks.

68. The masks delivered by Defendants to ALKALI were not actually made by 3M.

69. ALKALI revoked its acceptance of the masks.

70. All of the masks purchased from and through Defendants were seized by CBP as counterfeit and cannot be returned to Defendants as a result.

71. In material breach of contract, Defendants failed to perform in accordance with the terms of said contract to deliver N95 masks made by 3M.

72. As a direct result of Defendants' breaches, ALKALI has suffered significant damages, including the cost of the masks purchased from and through Defendants, lost profits, lost future sales, and the destruction of its business relationship with King County, Washington.

73. Wherefore, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,394,900, which represents the cost of the masks as paid by ALKALI plus reasonable attorney's fees, interest, and costs of this action.

## COUNT TWO – NEGLIGENT MISREPRESENTATION

74. Paragraphs 1 through 73 are hereby incorporated by reference.

75. ALKALI and Defendants entered into a special business relationship pursuant to which ALKALI agreed to purchase 3M N95 masks from Defendants for resale to King County, Washington.

76. The parties consummated purchases of these masks pursuant to which ALKALI procured 3M N95 masks for delivery to King County in exchange for ALKALI's payment for such masks.

77. Pursuant to this special business relationship, Defendants owed ALKALI a duty to act in good faith and to disclose all facts material to the parties' engagement, including the nature and true origin of the masks being delivered.

78. In supplying N95 masks to ALKALI, WANG and the other Defendants owed ALKALI a duty of care to ensure that the product provided met the specifications (*i.e.*, were

authentic 3M N95 masks) and standards and in a manner that would be acceptable to ALKALI and King County, Washington.

79. Defendants breached their duty to ALKALI by failing to provide authentic 3M N95 masks.

80. ALKALI reasonably and justifiably relied upon Defendants' false representations to its detriment.

81. As a direct and proximate result of Defendants' breach of their duty, ALKALI has suffered significant damages, including, but not limited to, the loss of the USD $2,225,000 sale of masks to King County, Washington.

82. WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $2,225,000, which represents the cost of the masks as paid by ALKALI as well as the profit which ALKALI lost when the sale was cancelled by King County, plus reasonable attorney's fees, interest, and costs of this action.

### COUNT THREE – FRAUDULENT MISREPRESENTATION

83. Paragraphs 1 through 82 are hereby incorporated by reference.

84. WANG and the other Defendants knew that ALKALI's customer King County required 3M N95 masks.

85. In the course of his dealings with ALKALI, WANG, acting personally and on behalf of the other Defendants, intentionally made false representations that the masks purchased by ALKALI were authentic 3M N95 masks.

86. Defendants knew these statements to be false when made because the masks being offered and which were sold to ALKALI were not made by 3M.

87. Defendants made material misrepresentations with the intent to deceive ALKALI.

88. Among such misrepresentations by Defendants were photographs provided to ALKALI by Defendants of purported 3M masks and their packaging before the purchases were made by ALKALI.

89. Defendants also presented the fraudulent masks and their packaging to ALKALI personnel for inspection, at which time they asserted and confirmed that the masks were actually made by 3M, which statements were in fact false.

90. WANG asserted to ALKALI that his company was an authorized distributor for 3M.

91. WANG and the other Defendants knew that these representations were false when they were made, or they made such statements in reckless disregard to the truth as to be equivalent to actual knowledge of falsity.

92. When WANG and the other Defendants made the aforementioned statements, they intended for ALKALI to rely upon his representations.

93. WANG and the other Defendants made these representations for the purpose of defrauding ALKALI and to increase their profit on the sale of the masks in their possession, which were worth more if believed to be made by 3M.

94. The misrepresentations were material to ALKALI, and Defendants knew or should have known that ALKALI would rely on those representations in entering into contracts and performing its obligations thereunder, among other things.

95. ALKALI had a right to rely on Defendants' misrepresentations regarding whether the masks were in fact made by 3M.

96. As a direct and proximate result of Defendants' fraudulent misrepresentations, ALKALI has suffered actual and other damages.

97. ALKALI had the right to, and did, reasonably rely on the representations, and would not have acted had the representations not been made.

98. As a direct and proximate result of Defendants' fraudulent misrepresentations, ALKALI has suffered significant damages, including, but not limited to, the loss of the USD $2,225,000 sale of masks to King County, Washington and the termination of ALKALI's business relationship with King County.

99. WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $2,225,000 for actual damages, which represents the cost of the masks as paid by ALKALI as well as the profit which ALKALI lost when the sale was cancelled by King County, plus punitive damages, reasonable attorney's fees, prejudgment interest, and costs of this action.

## **COUNT FOUR – TORTIOUS INTERFERENCE WITH CONTRACT**

100. Paragraphs 1 through 99 are hereby incorporated by reference.

101. At the time of making the sales to ALKALI, Defendants knew that the masks were to be shipped to ALKALI's customer, King County, Washington pursuant to ALKALI's contract with King County.

102. ALKALI had an ongoing business relationship with King County to provide PPE to King County.

103. At the time of making the sales to ALKALI, Defendants knew that King County required 3M N95 masks.

104. At the time of making the sales, Defendants knew or should have known that the masks were not in fact made by 3M.

105. Defendants misrepresented to ALKALI the true nature of the masks provided.

106. Defendants' actions tortiously interfered with ALKALI's contract with King County.

107. Defendants' sale of counterfeit masks caused ALKALI to breach its contract with King County.

108. Once the masks were delivered, they were seized from King County by CBP as counterfeit.

109. King County refused to pay ALKALI for the masks purchased from Defendants.

110. King County has not purchased any other goods from ALKALI since the masks were seized.

111. As a result of Defendants' tortious interference, ALKALI has lost the contract with King County to provide N95 masks, and King County has terminated their business relationship.

112. As a direct and proximate result of Defendants' tortious interference, ALKALI has suffered actual and other damages.

113. WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $2,225,000, more or less, which represents the cost of the masks as paid by ALKALI as well as the profit which ALKALI lost when the sale was cancelled by King County, plus punitive damages, reasonable attorney's fees, prejudgment interest, and costs of this action.

## COUNT FIVE – QUANTUM MERUIT

114. Paragraphs 1 through 113 are hereby incorporated by reference.

115. On December 30, 2020, January 5, 2021 and January 25, 2021, ALKALI entered into agreements with Defendants for the purchase of 3M N95 masks.

116. On those dates, WANG and/or the other Defendants delivered the masks to ALKALI.

117. In exchange, ALKALI paid Defendants in the amount of USD $1,434,500.

118. On or about February 11, 2021, CBP seized the masks as counterfeit.

119. The payment by ALKALI to Defendants for said masks constituted a benefit to Defendants.

120. The reasonable value of the benefit to Defendants was USD $1,434,500.

121. Defendants requested, knowingly accepted, and made use of the funds provided by ALKALI.

122. Defendants are merchants that, upon information and belief, normally conduct similar business transactions and were on notice that they were expected to have provided authentic 3M N95 masks in return for the sums paid by ALKALI.

123. Were Defendants to be allowed to retain the proceeds from this sale of fake masks to ALKALI, Defendants would be unjustly enriched in an amount equal to approximately USD $1,434,500.

124. Despite demand, Defendants have failed and refused to recognize their obligations to ALKALI.  As a result, the sum of approximately USD $1,434,500 remains justly due and owing from Defendants to ALKALI

125. WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $1,434,500 for actual damages, or such greater or lesser sum, which represents the cost of the masks as paid by ALKALI, plus reasonable attorney's fees, prejudgment interest, and costs of this action.

## COUNT SIX – UNJUST ENRICHMENT

126. Paragraphs 1 through 125 are hereby incorporated by reference.

127. On December 30, 2020, January 5, 2021 and January 25, 2021, ALKALI entered into agreements with Defendants for the purchase of 3M N95 masks.

128. On those same dates, WANG and the other Defendants delivered the masks to ALKALI.

129. In exchange, ALKALI paid Defendants in the amount of USD $1,434,500.

130. On or about February 11, 2021, CBP seized the masks as counterfeit.

131. The payment by ALKALI to Defendants for said masks constituted a benefit to Defendants.

132. Defendants requested, knowingly accepted, and made use of the funds provided by ALKALI.

133. Defendants are merchants that, upon information and belief, normally conduct similar business transactions and were on notice that they were expected to have provided authentic 3M N95 masks in return for the sums paid by ALKALI.

134. Were Defendants to be allowed to retain the proceeds from this sale of fake masks to ALKALI, Defendants would be unjustly enriched in an amount equal to approximately $2,225,000.

135. Despite demand, Defendants have failed and refused to recognize their obligations to ALKALI. As a result, the sum of approximately $2,225,000 remains justly due and owing from Defendants to ALKALI.

136. ALKALI lacks an adequate remedy at law to recover the sums paid to the Defendants.

137.   WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $2,225,000 for actual damages, or such greater or lesser sum, which represents the cost of the masks as paid by ALKALI as well as the profit which ALKALI lost when the sale was cancelled by King County, plus reasonable attorney's fees, prejudgment interest, and costs of this action.

## COUNT SEVEN – CONSPIRACY

138.   Paragraphs 1 through 138 are hereby incorporated by reference.

139.   Defendants entered into a conspiracy to defraud ALKALI and take its money in payment for counterfeit 3M N95 masks.

140.   In furtherance of their conspiracy, Defendants unlawfully procured and supplied counterfeit 3M N95 masks.

141.   Defendants misrepresented the true origin and nature of said masks to ALKALI.

142.   Defendants committed fraud in thus misrepresenting the masks and accepting payment for them.

143.   Defendants tortiously interfered with ALKALI's contract and business relations with King County, Washington.

144.   As a result, ALKALI suffered damages.

145.   WHEREFORE, ALKALI demands judgment in its favor against Defendants in the amount of USD $2,225,000, more or less, which represents the cost of the masks as paid by ALKALI as well as the profit which ALKALI lost when the sale was cancelled by King County, plus punitive damages, reasonable attorney's fees, prejudgment interest, and costs of this action.

## JURY DEMAND

146. ALKALI respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ALKALI respectfully requests that this Court render judgment, by:

a. Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

b. Damages in an amount to be determined at trial;

c. Costs of suit incurred herein;

d. Attorney fees; and,

e. Such other and further relief as the Court may deem to be just and proper.

Dated: November 3, 2021
      Washington, D.C.

**FISHERBROYLES, LLP**

By: /s/ Amy Epstein Gluck
Amy Epstein Gluck (D. Md. No. 20106)
FisherBroyles, LLP
1200 G Street, N.W., Suite 800
Washington, D.C. 20005
Telephone 301-526-1184
Amy.epsteingluck@fisherbroyles.com
Attorneys for Plaintiff ALKALI SCIENTIFIC, INC.